[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action to recover back rent, damages and attorney's fees in connection with the breach of a commercial lease. Defendant, The Spectacle, Inc. ("Spectacle") was a commercial tenant in the Caldor Shopping Center (the "Center") (located in Derby, Connecticut) pursuant to the terms of a written lease (the "Lease"). Spectacle's landlord under the Lease was plaintiff Samuel J. Heyman, the Center's owner.
In consideration for Mr. Heyman entering into the Lease with a corporate tenant, performance of Spectacle's financial obligations under the Lease was unconditionally guaranteed by Arnold Breault, James Valinsky and Arthur Dubail, all three of whom had an interest in Spectacle at the time the Lease was executed in August, 1992. The guaranties specifically recite that they are "absolute, unconditional, continuing and unlimited."
The Lease term commenced on December 12, 1988 and was so expire ten years later. The Lease required Spectacle to pay monthly installments of "fixed rent". Additionally, the Lease required Spectacle to pay, in monthly installments, "additional rent" which included (i) its pro rata share of real estate taxes and insurance charges and (ii) 115% of its pro rata share of common area maintenance expenses. Fixed rent and additional rent are collectively referred to herein as "rent".
Spectacle stopped paying its monthly installments of additional rent as of April, 1991.
On June 5, 1991, plaintiff mailed a notice of default of Spectacle. After service of the notice of default, plaintiff agreed to forbear from terminating the Lease provided that Spectacle make a series of payments to liquidate the arrears. Spectacle failed to make the agreed upon payments necessary to cure its default. Accordingly, on June 16, 1991, plaintiff served a notice terminating the Lease as of July 19, 1991. CT Page 8198
In connection with the termination of the Lease, a notice to quit was served on July 17, 1991 requiring Spectacle to vacate the premises by July 28, 1991. Spectacle failed to vacate the premises as required by the notice to quit. Accordingly, plaintiff was required to commence a summary process action in August 1991 to obtain possession of the premises.
Spectacle appeared in the summary process action but failed to plead. A judgment of possession was therefore rendered in favor of plaintiff on September 3, 1991, and Spectacle surrendered possession of the premises on or about that date.
Defendants have made no payments whatsoever to plaintiff since the termination of the Lease.
As of the date the Lease was terminated, Spectacle's rental arrearage amounted to $18,978.11. Retroactive common area maintenance charges for calendar year 1990 amount to an additional $922.15.
Plaintiff has been unable to relet the premises to date. Accordingly, plaintiff's liquidated damages through the date of trial will amount to $30,919.89.
Additionally, under paragraph 11.1.7 of the Lease, plaintiff is entitled to recover its costs of enforcement, including its reasonable attorney's fees, from the defendants. Plaintiff has been required to prosecute a summary process action as well as this action for damages. Plaintiff's attorney's fees and expenses through July 1992 amount to approximately $19,000.00.
It is uncontroverted that, as of the date the Lease was terminated, Spectacle (and thereby also the guarantor defendants) owed plaintiff back rent amounting to $18,978.11 as well as its unpaid pro rata share of the 1990 common area maintenance expenses, later determined to be $922.15. Plaintiff should clearly be awarded these amounts as well as interest on the back rent ($4,291.12) pursuant to paragraph 4.6 of the Lease.
Additionally, plaintiff is entitled to damages for breach of the Lease sufficient to restore it to the position that it would have been in had Spectacle performed its obligations thereunder. Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384, 389-90 (1989). The premises have not yet been relet. Plaintiff's loss of rent from the date the Lease was terminated through CT Page 8199 the date of trial ($30,919.89) is the proper measure of damages provided under he Lease (Paragraphs 11.1.3 and 12.1) and by Connecticut Law. Rokalor, supra at 390.
Finally paragraph 11.1.7 of the Lease provides that defendants must pay:
 Landlord's expenses, including reasonable attorneys' fees, incurred in enforcing any obligation of Tenant under this Lease or in curing any default by Tenant under this Lease.
Plaintiff's attorney's fees, court costs and related expenses through July 1992 amount to $18,932.51. (Plaintiff intends to submit, in a post trial memorandum, his legal expenses through trial). These fees and expenses are supported by plaintiff's counsel's detailed invoices, documentation upon which the Court may appropriately rely in determining "reasonable attorney's fees". Appliance, Inc. v. Yost, 186 Conn. 673, 681 (1982): Hoenig v. Lubetkin,137 Conn. 516, 525 (1951).
As has been noted, all of the defendants except Arthur Dubail ("Dubail") have been defaulted, and are obviously liable to plaintiff as discussed previously in this memorandum. Dubail, who unconditionally guaranteed Spectacle's financial obligations under the Lease, is also clearly liable to the plaintiff for breach of the Lease.
In an effort to defeat liability, Dubail alleges, by way of a variety of special defenses as well as a counterclaim, that despite his unequivocal, unconditional, absolute written guaranty, he should be excused from his obligations to the plaintiff because months after the Lease and guaranties were executed, Mr. Dubail apparently had a falling with his "partners" and withdrew from the business. He therefore claims that there was no consideration for his guaranty or, alternatively, that the guaranty was released.
While it is obviously Mr. Dubail's burden to prove these affirmative defenses, plaintiff submits that the evidence will plainly show that there is no basis for these claims.
It is elementary that execution of a guaranty contemporaneously with a lease, where the guaranty is an essential condition to the lease, is adequate consideration for the guaranty. Murphy v. Schwaner, 84 Conn. 420, 425
(1911); Garland v. Gaines, 73 Conn. 662, 666 (1901). CT Page 8200 See also Friedman on Leases 35.1, p. 1614 (1990). There is no question that execution of the Lease was the consideration for the Dubail guaranty when it was made; the guaranty so recites. Dubail's argument that the consideration somehow evaporated simply because he later parted company with his business co-venturers is plainly frivolous.
The defendant Dubail's claim on the counterclaim seems to be that after his deal with the other individual defendants fell apart, there were discussions with the plaintiff's agent, Kathleen Rorick (Heyman Properties' Director of Real Estate), which resulted in the release of Dubail's guaranty. The only document produced by Dubail to support this claim was a letter dated February 14, 1989, some six months after the Lease was executed by Dubail, from Ms. Rorick to Spectacle's attorney, Alphonse Ippolito. That letter states in full:
 I received your letter of February 8, 1989 [which requests a response as to the removal of Mr. Dubail and another individual guarantor] and the copies of the financial statements for the Breaults and James and Kathleen Valinsky. As I am away this week on vacation, would you please be kind enough to draft a document for Sam Heyman's signature whereby Dubail and Paillo are released as Guarantors under the lease.
It is undisputed that neither Spectacle's attorney nor any attorney for Mr. Dubail ever followed up on Ms. Rorick's letter and no release was ever executed. Neither Mr. Ippolito nor any other attorney for any of the defendants ever submitted to the plaintiff or any of his agents a proposed release of guaranty, although Mr. Ippolito (the spokesman for all of the defendants) clearly understood that no release would be effective in the absence of a written release executed by Mr. Heyman. As a factual matter, therefore, Mr. Dubail's release claim is fatally flawed. The court finds the release was never granted. There was insufficient evidence produced to indicate any release. In any event, there is a complete lack of consideration for said release.
Moreover, even if the parties had agreed that Mr. Heyman would release Mr. Dubail's guaranty, no such release could have been effective unless it was in writing and signed by Mr. Heyman. As a preliminary matter, the Lease includes a merger and integration provision (paragraph 13.13), which confirms that all covenants, promises, agreements, CT Page 8201 conditions or understandings between the parties are included in the written Lease, and further requires that any subsequent alterations, amendments, changes or additions to the Lease shall be binding only if reduced to writing and signed by the parties. In light of this provision, the Court will therefore enforce the express terms of the guaranty and shall not find a release in circumstances that are contrary to the terms of the guaranty and Lease. Compare CNB v. Foley, 18 Conn. App. 667, 671
and fn3 (1989).
Even apart from paragraph 13.13 however, it is plain that any release of the guaranty would have to be in writing signed by Mr. Heyman. The guaranty here is oar and parcel of the written ten year Lease. Thus, any purported-release of the guaranty would constitute a modification of the Lease. No such modification however would be effective unless it complied with the Statute of Frauds. See S.H.V.C. v. Roy, 37 Conn. Sup. 579, 582 (1981), aff'd, 188 Conn. 503
(1982) and cases cited therein.
The Rorick letter certainly does not suffice to satisfy the statute of frauds. The recipient cc the letter knew and understood that only Mr. Heyman had authority to release Dubail. Nor in any event would that letter suffice to establish a "completed agreement" to release Mr. Dubail from his guaranty. As noted above, it is undisputed that Mr. Heyman never even received, much less assented to the terms of, any proposed release. Under these circumstances, Dubail cannot rely on the Rorick letter, which expressly required the preparation of a formal release, to establish a release or agreement to release his guaranty. See Rosen v. Allen, 7 CSCR 623 (Housing Session GA #5 at Derby, 1992) (landlord's agent's letter confirming terms of lease modification and extension agreement held not to constitute an extension of the tenant's lease since letter expressly required parties' execution of a formal written agreement. See also Gallagher v. Kibride, 1990 Conn. Super. LEXIS 1968 (J.D. New Haven Housing Session 1990) (guaranty enforced despise conditional oral agreement to release it, where conditions were not met).
Finally, there can be no doubt that Mr. Dubail never gave any consideration for any purported release of the Dubail guaranty. There was not even any discussion between plaintiff and/or his representatives as to the consideration for any proposed release or any other terms of the proposed release. Thus, even if there had been an oral agreement that a release would be given, or even in the Rorick letter could somehow be interpreted as a release, no such release CT Page 8202 could be enforced in this case. Cf. Calamita v. Tradesmens' Nat'l Bank, 135 Conn. 326, 332 (1949) (invalidating a waiver of liability which was not supported by consideration).
In short, regardless of what Dubail may have thought or hoped as to his obligations under the guaranty, those obligations are fully set forth in the Lease and have never been released or modified in any respect. In these circumstances,
 The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. When the intention conveyed [in a guaranty] is clear and unambiguous, there is no room for construction.
Security Savings and Loan Ass'n. v. Magnum Development, 1991 Conn. Super. LEXIS 2163 (J.D. Waterbury 1991) and cases cited therein. The language of the Lease and guaranty are clear. Dubail is liable to the plaintiff.
However, as against the remaining defendants, defendant Dubail did revoke the business arrangement and was returned his financial contribution. The remaining defendants left defendant Dubail in a position of exposure to liability by indicating he was out of the business and free from financial exposure. In fact, they executed a document freeing him from liability. This was an unfair trade practice. The court finds that the defendant Dubail is entitled to indemnification from the remaining defendants for all damages and costs levied against them.
The court finds for the plaintiff as against all defendants for rent due as at the termination of the Lease in the amount of $30,919.89 plus costs. The court awards the plaintiff's attorney counsel fees in the amount of $18,937.51.
Philip E. Mancini, Jr., Judge State Trial Referee